IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 9:17-cv-80518-DMM |
| | ) | |
| v. | ) | |
| | ) | |
| LENA D. COTTON and PROFESSIONAL | ) | |
| ACCOUNTING LDC, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## UNITED STATES' THIRD MOTION FOR AN ORDER TO SHOW CAUSE

Date: May 28, 2020

Respectfully Submitted,

RICHARD E. ZUCKERMAN
Principal Deputy Assistant Attorney General
Tax Division

By: s/ Robert S. Silverblatt
ROBERT S. SILVERBLATT (#A5502257)
MARGARET S. SHOLIAN (#A5502491)
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 14198
Washington, D.C. 20044
202-514-8682 (v)
202-514-4963 (f)
Robert.S.Silverblatt@usdoj.gov
Margaret.S.Sholian@usdoj.gov

Of Counsel:

ARIANA FAJARDO ORSHAN
Acting United States Attorney

## Table of Contents

I.    Background on Defendants and Nominees ............................................................. 2

    A.    *Ms. Cotton gets a "final opportunity"* ..................................................... 2

    B.    *Ms. Cotton eschews responsibility* .......................................................... 4

    C.    *Defendants promptly begin defying the restrictions* ............................... 4

    D.    *Nominee Individuals have close professional and familial ties to Defendants* ............... 6

    E.    *Defendants use Nominees to circumvent the Court's restrictions* ................................. 7

    F.    *Defendants and Nominees have reduced their fraud to writing* ....................... 8

    G.    *Nominees are in no way independent from Defendants* ................................... 9

    H.    *The proceeds of the fraud flow to Ms. Cotton* ......................................... 9

    I.    *Defendants and Nominees are misleading their customers* ............................ 10

    J.    *Ms. Cotton is directly involved in the violations* ..................................... 11

II.    Examples of Abusive Returns .......................................................................... 12

    A.    *Nominees have committed the same type of fraud for the same customers* ................. 13

    B.    *Nominees have widened the reach of Defendants' schemes* ......................... 13

    C.    *Nominees have sometimes modified Defendants' schemes* ............................ 14

    D.    *Defendants' returns also violate the Court's orders* ..................................... 15

III.    Standards ............................................................................................................ 15

IV.    Argument ............................................................................................................ 16

    A.    *Defendants have violated the Court's orders* ........................................... 16

    B.    *Nominees have also violated the Court's orders* ....................................... 19

V.    Sanctions ............................................................................................................ 20

Conclusion ..................................................................................................................... 20

**Table of Exhibits**

Exhibit A: Transcript from March 2019 show cause hearing

Exhibit B: Defendants' Facebook post dated March 10, 2019

Exhibit C: Letter dated January 15, 2020 posted to Defendants' Facebook page

Exhibit D: Declaration of IRS Supervisory Revenue Agent Christopher Dickerson

Exhibit E: Chart explaining connections between Nominee Individuals and Nominee Entities

Exhibit F: Boone deposition transcript

Exhibit G: Wise return

Exhibit H: Palm Beach State College subpoena response

Exhibit I: Agreement between Defendants and Professional Accounting by R&K

Exhibit J: Agreement between Defendants and Temple Financial Solutions

Exhibit K: Frazier Declaration

Exhibit L:  Morgan-Wright subpoena and subpoena response

Exhibit M: Records of payments from Defendants to Nominee Individuals

Exhibit N: Wise subpoena response

Exhibit O: TD Bank statements

Exhibit P: Revocation of agreement between Defendants and Professional Accounting by R&K

Exhibit Q: Revised agreement between Defendants and Professional Accounting by R&K

Exhibit R: Revocation of agreement between Defendants and Temple Financial Solutions

Exhibit S: Revised agreement between Defendants and Temple Financial Solutions

Exhibit T: E-mail chain regarding preparation of taxes

Exhibit U: Abalsamo Schedule C

Exhibit V: Compilation of e-mails

Exhibit W: Form showing Nominees' use of Defendants' logo

Exhibit X: Powers declaration

Exhibit Y: Powers Schedule C

Exhibit Z: Mosley return (customer copy)

Exhibit AA: Mosley return (filed copy)

Exhibit BB: Saintil return

Exhibit CC: Gordon return

Exhibit DD: Brian Cotton return

Exhibit EE: Hatata return

Exhibit FF: Pinquiere return

Exhibit GG: Claude return

Exhibit HH: Compilation of returns with apparently manipulated numbers

Exhibit II: Alam return

## <u>UNITED STATES' THIRD MOTION FOR AN ORDER TO SHOW CAUSE</u>

Shortly after the Court imposed stringent restrictions on her business, Lena Cotton brazenly set out to do through nominees the very same activities that she is prohibited from undertaking herself. Almost overnight, three new return preparation businesses emerged. They are located in Ms. Cotton's office space, and they are staffed by Ms. Cotton's employees, many of whom are also her relatives. They use Ms. Cotton's computers to prepare returns for her customers. And the payment for their work goes straight to Ms. Cotton. Through these nominees, Ms. Cotton has attempted to evade every single restriction in the Court's order: the limitation on the number of returns she can prepare, as well as the prohibition on the preparation of returns for individuals who file a Schedule C and for businesses. The result has been the continued preparation of fraudulent returns.

Defendants' latest scheme involves a wide-ranging cast of accomplices. In particular, Ms. Cotton has used Anthony Boone, Donellar Wims-Boone, Latesha Temple, Melissa Morgan-Wright, Kelly Dunlop, Matthew Dunlop, and Richard Wise to circumvent the Court's restrictions. These individuals perpetrate Ms. Cotton's fraud through three entities: Professional Accounting by R&K, Professional Accounting by MM, and Temple Financial Solutions. This motion refers to the seven individuals as "Nominee Individuals," to the three entities as "Nominee Entities," and to the individuals and entities collectively as "Nominees." Because Ms. Cotton oversees this rogue operation, and because Nominees are acting in concert and participation with her, the Court should direct Ms. Cotton, her business, and Nominees to show cause why they should not be held in contempt and sanctioned.

The United States also requests that the Court schedule an evidentiary hearing—either telephonically or by video—at its earliest convenience. Although the pandemic has slowed many

businesses, Defendants and Nominees have shown no signs of abating their fraud in recent

months. To the contrary, with the tax deadline extended to July 15, they now have more time to

carry out their scheme this filing season. As a result, absent prompt relief, they are likely to

continue flaunting the Court's directives, thereby causing irreparable injury to the Treasury.

## I.      Background on Defendants and Nominees

From the moment the Court entered the first injunction in this case in 2017, Defendants

have attempted to sidestep the restrictions. Their initial defiance led the Court to hold them in

contempt and give them a "<u>final opportunity</u>" to operate a legitimate enterprise. ECF No. 83 at

17 (emphasis in original). But they have squandered that opportunity. Instead of complying with

the Court's directions, they have employed a network of individuals and entities to engage in

prohibited actions. As described below, Defendants and Nominees have close professional and

familial connections. Defendants oversee Nominees' work and profit from the returns that

Nominees file. Because the arrangement is an obvious violation of the Court's orders,

Defendants and Nominees have gone to great lengths to mislead their customers and the United

States.

### A.  Ms. Cotton gets a "final opportunity"

Based on allegations of fraudulent tax return preparation, the United States filed a

complaint in April 2017 for a permanent injunction against Ms. Cotton and her business,

Professional Accounting LDC, LLC. ECF No. 1. In November 2017, the Court entered a

stipulated injunction. ECF No. 39. The injunction allowed Defendants to continue operating but

barred them from certain abusive schemes. The Court specifically warned that violations of the

order could result in a "permanent injunction barring Defendants from tax return preparation."

*Id.* at 3. Violations promptly ensued.

First, Defendants ignored the requirement in the injunction that they hire a compliance monitor who is approved by the United States. Instead, Defendants unilaterally selected a monitor and then ignored the United States' objections to his qualifications. After eventually hearing that monitor's testimony, the Court remarked: "I have never seen a monitor as bad as that in my years of being a judge." Exhibit A at 242:11-12.

The engagement of an incompetent monitor was not a minor infraction. Without any oversight of their activities, Defendants continued to engage in the schemes the November 2017 order was designed to stop. Worse, Defendants also expanded into new forms of fraud. These violations led the United States to file two show cause motions. *See* ECF Nos. 41, 49.

Following an evidentiary hearing in March 2019, the Court temporarily barred Defendants from return preparation pending further findings. *See* ECF No. 70. Those findings came in August 2019. *See* ECF No. 83. The Court held Defendants in contempt and placed additional restrictions on their business. First, the Court limited Defendants to no more than 750 returns per year. *Id.* at 16. Second, the Court permanently barred Defendants from preparing returns with a Schedule C, which is where self-employed individuals report their profits or losses. *Id.* Similarly, Defendants were permanently banned from preparing returns for businesses, such as corporations and partnerships. *Id.* These restrictions stemmed from the Court's conclusions that Defendants' errors were "pervasive" and that Defendants are "incapable of proper preparation" of anything other than simple returns. *Id.* at 16.

The Court opted for further restrictions instead of a complete bar on preparation based on Ms. Cotton's expressions of contrition and self-improvement during the evidentiary hearing. *Id.* at 14. However, the Court was also clear that the additional restrictions were Defendants' "final opportunity." *Id.* at 17 (emphasis in original). The Court wrote: "In the event the Court

3

determines that Defendants, going forward from the date of this Order, engage in any further violations of the Injunction (DE 39) *or* this Order, the remedy <u>shall</u> be a permanent ban on tax return preparation." *Id.* (emphases in original).

### B. Ms. Cotton eschews responsibility

Outside the Court's presence, Ms. Cotton was anything but contrite. On March 10, 2019, just days after the hearing, Ms. Cotton took to Facebook to post about this litigation. Instead of taking responsibility for her actions, she blamed her customers—the same ones whose testimony the Court credited—and said that they "lied under oath." Exhibit B. She even threatened to "tak[e] action" against the witnesses. *Id.* And even in the face of the substantial evidence presented at the hearing, she denied understating customers' liabilities, writing that this is "far from what I would ever do." *Id.* Her campaign of denial continued into 2020, when she wrote a letter to all of her customers in which she accused witnesses of "lying under oath" and being "very dishonest." Exhibit C.

### C. Defendants promptly begin defying the restrictions

Defendants' defiance of the Court's directives was immediate and came in two forms. First, after the Court ordered Defendants to temporarily shut down, Defendants' employees began filing paper returns in direct violation of that order. Right up until the March show cause hearing, Defendants were electronically filing their returns. Exhibit D (Dickerson Decl.) ¶ 11. The bulk of the pre-hearing returns were signed by Ms. Cotton, but Defendants' employees, including Melissa Morgan-Wright, Latesha Temple, and Kelly Dunlop, were also signing a substantial number and filing them under Professional Accounting LDC's electronic filing number ("EFIN"). *Id.* ¶ 12. EFINs are issued by the IRS to electronic filers in order to tie them to the returns they submit. *Id.* ¶ 10. After the hearing, and continuing during the entire period

4

when Defendants' doors were supposed to be closed, Ms. Morgan-Wright, Ms. Temple, and Ms. Dunlop kept preparing returns. *Id.* ¶¶ 5–6. Because the three of them did not yet have their own EFINs, any electronic filings would have required them to use Defendants' filing credentials, which in turn would have led to immediate detection. *Id.* ¶¶ 13–14. As a result, they began mailing their returns in paper form instead of electronically filing them. *Id.* ¶¶ 5, 13. Although the paper returns identified Ms. Morgan-Wright, Ms. Temple, and Ms. Dunlop as the preparers, *id.* ¶ 9, the three of them, along with Defendants, were apparently hoping that the IRS would not recognize their connection to Ms. Cotton. This plan partly paid off, as it took significantly longer to detect the fraud than it would have had they filed electronically using Defendants' credentials. *Id.* ¶ 13.

All told, Ms. Morgan-Wright, Ms. Temple, and Ms. Dunlop filed 157 paper returns between March 4, 2019 and August 15, 2019, which is the period of the Court-ordered shutdown. *Id.* ¶ 6. The IRS received the first of these on March 9, just days after the Court's order prohibiting Defendants from preparing returns. *Id.* Of the 157 returns, 123—or more than 78 percent—were for customers for whom Defendants filed electronic returns in 2018. *Id.* ¶ 7. Thus, it is clear that Defendants were continuing to operate their business, albeit in a way designed to avoid detection.

Second, in the months after the hearing, three entities—Professional Accounting by R&K, Professional Accounting by MM, and Temple Financial Solutions—submitted applications to the IRS for EFINs. *Id.* ¶ 15. These EFINs, which the entities ultimately received, allowed them to resume electronically filing because they could submit returns without using Defendants' credentials. All of their applications listed their address as 3676 Collin Drive in West Palm Beach, which is the same address Defendants use. *Id.* ¶ 17. Whereas Defendants'

address says Suite 15, the three entities all list Suite 14. *Id.* Professional Accounting by R&K and Professional Accounting by MM are both sole proprietorships, owned by Ms. Dunlop and Ms. Morgan-Wright, respectively. *Id.* ¶ 16. Meanwhile, Temple Financial Solutions is a corporation whose sole officer is Ms. Temple. *Id.*

      The remaining Nominee Individuals have joined Ms. Morgan-Wright, Ms. Temple, and Ms. Dunlop in preparing returns for the three Nominee Entities. *Id.* ¶¶ 24–27. A chart explaining the connections between Nominee Individuals and Nominee Entities is attached as Exhibit E. As reflected in that exhibit, there is substantial overlap between these entities. For instance, Ms. Dunlop has sometimes used Ms. Temple's entity to file returns, and vice-versa. *See* Exhibit E; *see also* Exhibit D (Dickerson Decl.) ¶¶ 26–27.

      *D.  Nominee Individuals have close professional and familial ties to Defendants*

      The one common thread among Nominee Individuals is Ms. Cotton and her business. For starters, several of them are related to Ms. Cotton. Mr. Boone is Ms. Cotton's uncle. Exhibit F at 14:20-21. He lives rent-free in a home owned by Ms. Cotton. *Id.* at 18:6–19:2. Ms. Wims-Boone is Ms. Cotton's aunt by marriage. *Id.* at 49:17-24. And Ms. Temple is married to Ms. Cotton's cousin. *Id.* at 58:15-24.

      Beyond that, with the possible exception of Mr. Wise, Nominee Individuals all worked for Defendants before Nominee Entities began operating. Mr. Boone has done compliance work for Defendants and served as the liaison between Defendants and Donald Scherzi, the CPA who served as Defendants' unauthorized compliance monitor. Exhibit A at 217:1-3. Mr. Dunlop, who is Ms. Dunlop's son, has worked for Defendants doing data entry and answering phone calls. Exhibit F at 59:11-18. Ms. Morgan-Wright is a longtime return preparer for Defendants. Exhibit A at 179:5-8. Ms. Dunlop, Ms. Wims-Boone, and Ms. Temple originally did clerical work for

Defendants, and in 2019, their responsibilities expanded to include preparing returns. *Id.* at 179:5-12, 222:5-11; Exhibit F at 49:17–50:7, 54:21-24, 58:16–59:7.

Although it is not clear whether Mr. Wise previously worked for Defendants, he at the very least has been a customer of their return preparation business. He has also been the beneficiary of an apparently fraudulent education credit claim filed by Defendants. In particular, Defendants filed a tax year 2012 return for Mr. Wise claiming a credit based on his purported attendance at Palm Beach State College. Exhibit G at 12. But that school, in response to a subpoena, said that it had no record of Mr. Wise attending during the relevant timeframe. Exhibit H. The timing of Mr. Wise's decision to enter the tax preparation business also suggests a connection to Defendants. He obtained filing credentials from the IRS on March 13, 2019, the week after the Court entered an order temporarily shutting down Defendants' business. Exhibit D (Dickerson Decl.) ¶ 19.

###### E. Defendants use Nominees to circumvent the Court's restrictions

Defendants use Nominees to accomplish precisely what the Court has barred them from doing. As previously noted, Nominees continued to file returns even after the Court ordered Defendants to temporarily shut down. Moreover, starting in August 2019, when the Court allowed Defendants to resume operating but with added restrictions, Defendants started using Nominees to circumvent those limitations. The Court's order restricts Defendants to 750 returns per year. As of May 13, 2020, Defendants have filed 231 returns so far this year using their own credentials. *Id.* ¶ 20. But when Nominees' returns are counted, that number swells to at least 1,928. *Id.* ¶ 20–21. Of the 1,697 returns Nominees have filed so far this year, at least 1,350 have been for customers who previously used Defendants as their return preparer. *Id.* ¶ 22. Beyond that, Defendants are barred from preparing Schedule C returns, but Nominees have done at least

265 of them this year as of May 13. *Id.* ¶ 23. And although Defendants cannot prepare returns for businesses, Nominees have filed at least 72 such returns this year as of May 13. *Id.* ¶ 21.

     F.  *Defendants and Nominees have reduced their fraud to writing*

To the extent that there was any doubt that Nominees are fronts for Defendants, two written agreements place the relationship beyond doubt. In January 2020, Ms. Cotton, on behalf of Professional Accounting LDC, signed contracts with Professional Accounting by R&K and Temple Financial Solutions. Exhibits I–J. The United States obtained these documents this month in response to subpoenas. In the agreements, Defendants hire Professional Accounting by R&K and Temple Financial Solutions, purportedly as independent contractors, for their "tax preparation services." Exhibit I at 1; Exhibit J at 1. In other words, it is immediately clear that the two entities are doing return preparation directly for Defendants. The agreements provide that Professional Accounting by R&K and Temple Financial Solutions can use Defendants' office space, as well as Defendants' computers and "proprietary materials." Exhibit I at 2; Exhibit J at 2.

Curiously, although Ms. Dunlop and Ms. Temple produced their entities' agreements with Defendants, Ms. Morgan-Wright did not produce one between Professional Accounting by MM and Defendants. Exhibit K (Frazier Decl.) ¶ 14. Instead, Ms. Morgan-Wright appears to be attempting to hide her involvement in the preparation of prohibited returns. In response to subpoena requests asking her for Schedule C and business returns she has filed since August 2019, she responded by saying that there were no such returns. Exhibit L at 6–7 ¶¶ 9–10 (subpoena requests), 1 ¶¶ 9–10 (responses). In reality, during the timeframe at issue in the subpoena, Ms. Morgan-Wright prepared at least fourteen Schedule C returns, and Professional Accounting by MM submitted at least five business returns. Exhibit D (Dickerson Decl.) ¶ 29.

### G.  Nominees are in no way independent from Defendants

As discussed below, Defendants cannot circumvent an injunction by bringing on independent contractors to engage in prohibited acts. But even if they were allowed to do so, the whole arrangement was a sham from the outset. Even as Defendants have purported to enter into independent contractor relationships, they have continued to compensate some or all of Nominee Individuals as employees. Defendants have admitted to paying employee—as opposed to independent contractor—compensation to Ms. Dunlop, Mr. Dunlop, Ms. Wims-Boone, and Ms. Morgan-Wright in 2020. Exhibit M. The reason it is clearly employee compensation is that taxes are withheld, *id.*, which would not happen for contractors. Relatedly, Mr. Wise disclosed in response to a subpoena that he has been receiving cash payments from Defendants. Exhibit N at 1 ¶ 1. It is not clear whether Defendants are withholding taxes on those payments to Mr. Wise.

Additionally, even as they prepare returns for Nominee Entities, various Nominee Individuals have continued to file returns on behalf of Professional Accounting LDC this year. Exhibit D (Dickerson Decl.) ¶ 28. This purported dual-hatted role—working for Defendants for returns Defendants are allowed to prepare and then bringing prohibited customers to Nominee Entities—strains credulity.

### H.  The proceeds of the fraud flow to Ms. Cotton

These contrivances have led to a familiar result. Just as they always have, the fees paid by customers, some of which come out of refunds issued by the Treasury, flow directly to Ms. Cotton. As far as the United States can tell, the proceeds from Nominees' return preparation go straight into a TD Bank account in the name of "Lena Cotton DBA Professional Accounting." Indeed, Nominee Entities do not even appear to have any bank accounts in their names. By contrast, Ms. Cotton's TD Bank account has received more than *$250,000* in deposits between

January and April of 2020. Exhibit O at 1, 7, 13, 19. From those deposits, Ms. Cotton has

distributed $55,000 in cash to herself in that same timeframe. *Id.* at 6, 12, 18.

Defendants' profits seem to be the whole purpose of the arrangement. The independent

contractor agreements provide that Nominee Entities will receive "a percentage" of the gross

revenues they generate. Exhibit I at 2; Exhibit J at 2. This percentage is not specified in the

agreements, and there is no evidence that any commissions have been paid to date.[1] Moreover,

the employee compensation that Nominee Individuals receive is slated to be deducted from the

commissions. Exhibit I at 2; Exhibit J at 2. This structure—particularly the glaring omission of

the percentage level at which the commissions will be set—is inconsistent with an arms-length

transaction.

### I.   *Defendants and Nominees are misleading their customers*

Even though Defendants have—on paper—tried to create a layer of separation between

themselves and Nominees, it has been business-as-usual in the eyes of their customers. For

instance, numerous customers with Schedule C income or losses have sent e-mails to

Defendants' address, incometaxmail@aol.com, that are directed to Ms. Cotton and ask her to

prepare their returns. One self-employed customer wrote: "Hello Lena, I am sending you all our

tax info so yo[u] can process our taxes." Exhibit T.  Mr. Boone responded from Defendants'

account and asked the customer to fill out a Schedule C form. *Id.* Nominees apparently prepared

the return, which included a Schedule C. *See* Exhibit U. But there is no evidence in the

---

[1] There is a sample calculation in the agreements that assumes an 80-percent commission, but there is no indication that this is the actual rate. *See* Exhibit I at 2; Exhibit J at 2. Beyond that, it seems unlikely that any commissions will ever be paid for returns that have already been prepared. Earlier this month, after the United States served subpoenas on Nominees, Professional Accounting by R&K and Temple Financial Solutions revoked their agreements with Defendants, declared them to be void, and swapped them for new ones. *See* Exhibits P–S. These new agreements, however, are nearly as objectionable as the original ones.

customer's file that anyone ever corrected her understanding that Ms. Cotton would be doing her taxes. This is hardly an isolated case. *See* Exhibit V (compilation of other similar examples from customers who had a Schedule C prepared by Nominees).

These charades extended to in-person visits. This year, customers went to the same office, staffed by the same people, as always. Nominees even use Defendants' logo, which appears to show Uncle Sam's fist holding someone upside down and shaking out money. *Compare* Exhibit C (logo on Defendants' letterhead), *with* Exhibit W (logo on Nominees' paperwork). When Ms. Cotton's customers asked why they were meeting with someone different this year, Nominees merely deflected. For example, customer Nicole Powers was "surprised" to learn that she would be meeting with Ms. Dunlop instead of Ms. Cotton. Exhibit X (Powers Decl.) ¶ 6. When Ms. Powers, who has a Schedule C on her return, asked about the change, Ms. Dunlop told her that Ms. Cotton was "working at another job." *Id.*; *see also* Exhibit Y (Ms. Powers's Schedule C). Nobody informed Ms. Powers that Defendants were not allowed to prepare returns with a Schedule C. Exhibit X (Powers Decl.) ¶ 7. And as far as Ms. Powers was concerned, she and her husband, Ken Powers, "were using the same tax preparation business, run by Ms. Cotton, that we have used in previous years." *Id.* ¶ 11. Although Ms. Powers's return was filed by Professional Accounting by R&K, she has no idea what that entity is. *Id.*

  *J. Ms. Cotton is directly involved in the violations*

Apart from overseeing Nominees, profiting from their work, and defrauding customers, Ms. Cotton has also been directly involved in the preparation of Schedule C returns. Ms. Powers's return is a prime example. Ms. Powers, who has an accounting background and works as an auditor, was "very concerned" by Ms. Dunlop's apparent lack of "any tax-related knowledge." *Id.* ¶ 8. Ms. Powers and her husband file separate, as opposed to joint, returns. *Id.*

11

¶ 2. Ms. Dunlop got their paperwork "all mixed up" and tried to put Ms. Powers's expenses on her husband's return. *Id.* ¶ 8. As a result, Ms. Powers and her husband asked if "Ms. Cotton could review the returns before they were filed." *Id.* ¶ 9. Ms. Dunlop agreed to that. *Id.*

After not hearing anything, Mr. Powers wrote an e-mail to Defendants' address, copying Ms. Cotton's personal e-mail address. He said: "We met with Kelly who completed our 2019 tax returns for us since Lena was not there. She was going to have Lena review our tax returns and let us know if there were any changes or if all was good." *Id.* ¶ 10 & Ex. 1. Mr. Boone responded from Defendants' address, with Ms. Cotton once again copied, and said: "***Lena reviewed your taxes and all is well. Taxes have been submitted***." *Id.* (emphasis added). Thus, Ms. Cotton was directly involved in the preparation and approval of a Schedule C return. Although Nominees included Ms. Powers's customer file in a subpoena response, they excluded this e-mail chain, even though it was plainly responsive. Exhibit K (Frazier Decl.) ¶¶ 6, 8–10. Defendants similarly failed to produce it in response to requests for production that targeted such communications. *Id.* ¶¶ 6, 11. The United States only learned of it by speaking directly with Ms. Powers.

A second example is a tax year 2019 return prepared for Gary Mosley. In the customer's copy of the return, Ms. Cotton is listed as the preparer, and her electronic signature is included. Exhibit Z at 16. But by the time the return, which includes a Schedule C, was filed with the IRS, Ms. Cotton's name had disappeared. Exhibit AA at 2, 11. In its place appeared Ms. Wims-Boone's name. *Id.* at 2. Thus, Ms. Cotton apparently prepared the return, but Nominees seem to have helped her attempt to mask her involvement.

## II.    Examples of Abusive Returns

The returns prepared by Nominees have many of the same badges of fraud that have long marked Defendants' returns. This is not surprising. As far as we are aware, Nominees all lack a

formal accounting background, and only one of them, Ms. Morgan-Wright, has meaningful

experience preparing returns. *See* Exhibit A at 179:5-12. All of them appear to have learned

directly from Ms. Cotton. *Id.* at 179:10-23. As outlined below, Nominees and Defendants have

employed a variety of schemes—some old and some new—that have resulted in abusive filings.

    A. *Nominees have committed the same type of fraud for the same customers*

    In some of the most egregious cases, Nominees have committed the exact same fraud as

Defendants for the exact same customers. For instance, Defendants frequently abused the

American Opportunity Tax Credit, which allows for the deduction of certain education-related

expenses. Although the credit can only be claimed for a particular student for a maximum of four

years, Defendants regularly ignored that limitation. Following the evidentiary hearing, the Court

found that Defendants claimed the credit for 30 students who were already maxed out. ECF No.

83 at 19. All of the students were identified by name and by the last four digits of their Social

Security numbers in an exhibit introduced by the United States, and three of them, including

Lovely Saintil, were identified by name in the Court's findings. *Id.*; ECF No. 74-33.

Nonetheless, Nominees once again claimed the credit for tax year 2019 on behalf of two of those

students, Ms. Saintil and Shatia Gordon, despite having notice, as a result of the Court

proceedings, of the impermissibility of those claims. Exhibit BB at 11; Exhibit CC at 4.

    B. *Nominees have widened the reach of Defendants' schemes*

    Elsewhere, Nominees have committed precisely the same type of abuse as Defendants,

but for customers whose returns were not previously flagged in this litigation. On two tax year

2019 returns, Nominees took Schedule C car and truck deductions for customers who

purportedly used their vehicles exclusively for business purposes. Exhibit DD at 19–20; Exhibit

EE at 9–10. For one of those returns, the customer is Ms. Cotton Cotton's brother. Exhibit F at

50:16-19. As the Court found in response to Defendants' similar claims, these deductions "are almost certainly erroneous." ECF No. 83 at 20. Although the United States subpoenaed Nominees for all tax year 2019 Schedule C returns they have filed, Nominees excluded from their production both of the returns claiming 100 percent vehicle use. Exhibit K (Frazier Decl.) ¶¶ 6, 12–13.

### C. Nominees have sometimes modified Defendants' schemes

Nominees have also carried on some of Defendants other frauds, albeit with twists. A prime example is the home office deduction. Defendants' main home office scheme was to double count expenses, but Nominees have expanded into different, but related, types of abuse. Take, for instance, the tax year 2019 return Nominees filed for a husband, who earned $8,771 in gross income as an Uber driver, and his wife. Exhibit FF at 18. On the return, Nominees took the head-scratching position that the husband used 2,000 square feet out of the couple's 3,019 square foot home regularly and exclusively for his job as an Uber driver. *Id.* at 7. On that basis, Nominees deducted roughly two-thirds of the couple's home-related expenses. *Id.* Thus, Nominees claimed $19,248—more than twice the husband's gross income from Uber—in home office expenses, some of which will be carried forward to tax year 2020. *Id.* at 7–8.

In another variation, Nominees appear to have evolved one of Defendants' schemes in an attempt to avoid detection. During the March 2019 evidentiary hearing, the Court heard testimony that Defendants' frequent use of even, rounded numbers on Schedule C returns suggested that some of the claimed expenses were at best estimated and possibly fabricated. Exhibit A at 114:8-11. Likely to avoid scrutiny, Nominees have made changes to some of the even, rounded numbers that customers have provided. In one customer file, there are handwritten notes reflecting that the taxpayer spent $200 on uniforms and $75 on lotion. Exhibit GG at 18.

14

Case 9:17-cv-80518-DMM   Document 88   Entered on FLSD Docket 05/28/2020   Page 18 of 24

But on the filed Schedule C, Nominees changed $200 to $198 and $75 to $74. *Id.* at 29, 37. There are no bank records in the file to support such changes. Instead, Nominees seem to be attempting to make the numbers look more legitimate. These edits were a common occurrence in returns prepared by Nominees. *See* Exhibit HH (compilation of similar examples).

> D.  *Defendants' returns also violate the Court's orders*

Because Ms. Cotton is using Nominees to prepare Schedule C returns, as well as ones for businesses, the returns she is personally signing are relatively simple. But that does not mean that they are accurate. On a tax year 2019 return for a married couple with $20,536 in income, Ms. Cotton claimed ***$105,494*** in itemized deductions, which generated a refund of $8,533. Exhibit II at 45–46. This resulted from Ms. Cotton deducting the entire balance of their mortgage ($104,880), as opposed to only the mortgage interest paid during the tax year ($5,471), which is all she was allowed to write off. *Id.* at 38, 48. This at the very least violates the November 2017 injunction's prohibition against negligent claims. *See* ECF No. 39 at 4.

Ms. Cotton also seems to ignoring the requirements in the November 2017 injunction and the August 2019 order to collect and retain documents. *See id.* at 5 ¶ II.A.4; ECF No. 83 at 16–17 ¶ 7. The United States recently requested evidence that Ms. Cotton is complying with those provisions. Exhibit K (Frazier Decl.) ¶ 15. She did not produce any such evidence. *Id.*

### III.    Standards

The power to find a person or entity in civil contempt stems from the Court's inherent authority to enforce compliance with its lawful orders. *Citronelle–Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1301 (11th Cir. 1991). "A party seeking civil contempt bears the initial burden of proving by clear and convincing evidence that the alleged contemnor has violated an outstanding court order. Once a prima facie showing of a violation has been made, the burden of

15

production shifts to the alleged contemnor . . . ." *CFTC v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir. 1992) (per curiam) (internal citations omitted).

An injunction binds the following individuals who have actual notice, "by personal service or otherwise," of the order: parties; officers, agents, servants, employees, and attorneys of parties; and other persons who are in active concert or participation with anyone else bound by the order. Fed. R. Civ. P. 65(d)(2). In light of this, the Court can hold persons and entities in contempt even if they are not parties to the underlying litigation. *FTC v. Leshin*, 618 F.3d 1221, 1232 (11th Cir. 2010); *Taser Int'l, Inc. v. Phazzer Elecs., Inc.*, No. 6:16-cv-366, 2017 WL 3584906, at *4 (M.D. Fla. July 21, 2017) ("Therefore, Rule 65(d) provides that nonparties . . . can be bound by an injunction or face contempt for assisting a named party's violation of an injunction.").

## IV.    Argument

Defendants and Nominees are subject to the Court's orders and have engaged in widespread violations. Their defiance has led to the continued preparation of bogus returns—the very result the Court's orders were designed to prevent. As a result, they should all be ordered to show cause why they should not be held in contempt.

### A. *Defendants have violated the Court's orders*

The November 2017 stipulated injunction, as modified by the Court's August 2019 order, prohibits Defendants from committing violations "directly or indirectly." *See* ECF No. 39 at 4–7; ECF No. 83 at 16 (incorporating the November 2017 injunction). Nonetheless, Defendants have violated the Court's orders through both direct and indirect means. As for direct action, Defendants, through Ms. Cotton, have assisted in the preparation of Schedule C returns, as reflected in the Powers declaration (Exhibit X) and the customer copy of the

16

Mosley return (Exhibit Z). Defendants, through Ms. Cotton, have also engaged in negligent return preparation and have apparently failed to keep and maintain records as required by the Court's orders.

However, it is Defendants' use of Nominees that is most contemptuous. At the outset, Nominee Individuals are subject to the injunction as Defendants' employees. Most or all of them were Defendants' employees before the Court's August 2019 order, and even after the formation of Nominee Entities, Defendants have continued to pay most or all of Nominee Individuals as employees. But beyond that, to the extent that Defendants sought to avoid this outcome through independent contractor agreements, their efforts are legally irrelevant. Although Rule 65(d)(2) refers specifically to "employees" being bound by an injunction, courts regularly apply this principle in return preparer cases such as this one to bind independent contractors. *See, e.g.*, *United States v. Broomfield*, No. 3:15-cv-1654, 2017 WL 6375619, at *2 (D.S.C. Nov. 20, 2017); *United States v. Edmond*, No. 2:13-cv-02938, 2016 WL 7192169, at *5 (W.D. Tenn. Dec. 12, 2016).

Moreover, Rule 65(d)(2), which is designed to prevent a party from "nullify[ing] a decree by carrying out prohibited acts through aiders and abettors," specifically references those acting in active concert or participation with a party. *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945); *see also ADT LLC v. NorthStar Alarm Servs., LLC*, 853 F.3d 1348, 1352 (11th Cir. 2017). Such a relationship exists "between non-parties and already-enjoined parties in cases where an enjoined party is substantially intertwined with a non-party, including the shared occupation of office space, payment of employee expenses between the non-party and enjoined party, considerable control by the enjoined party over the non-party's operations, and other substantial interconnections." *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 327 F. Supp. 3d

606, 638 (S.D.N.Y. 2018) (internal quotation marks omitted); *see also Scalia v. Paragon Contractors Corp.*, 796 F. App'x 962, 968 (10th Cir. 2019) (noting that "contempt orders are binding on entities that operate as merely a disguised continuance of the old employer") (internal quotation marks omitted).

      Here, Defendants and Nominees operate out of the same office space and prepare returns for the same client pool, with the sole difference being that Nominees step in to handle the types of returns that Defendants are barred from preparing. Defendants pay Nominee Individuals a salary (and a purported commission), and there is no evidence that Nominees bear any of their own costs. Meanwhile, Defendants provide Nominees with customers, run Nominees' operations using Defendants' e-mail address, and profit from Nominees' work. As reflected by the Powers declaration (Exhibit X), Defendants also review Nominees' returns. All of this constitutes control. There are also other "substantial interconnections," including both employment and familial relationships, between Defendants and Nominees.

      In *Scalia*, the Department of Labor obtained an injunction against a construction company named Paragon and related individuals. 796 F. App'x at 964. Afterward, a new company, Par 2, emerged. Par 2's articles of incorporation were filed by the brother of Paragon's owner. *Id.* at 965. Although the owner was named in the injunction, the brother was not. *Id.* at 964–65. Par 2 used the same e-mail address as Paragon and operated out of the same office space. *Id.* at 965. Additionally, several of Par 2's employees previously worked for Paragon. *Id.* In an attempt to conceal the entities' relationship, Par 2 submitted altered documents to the Department of Labor. *Id.* at 965–66. Based on that, the Seventh Circuit had little difficulty agreeing that Par 2 and the enjoined parties were acting "in active concert or participation" to "evade" the injunction. *Id.* at 968.

As in *Scalia*, there are close professional and familial relationships between the enjoined parties and those aiding them. This case also features similar efforts to conceal evidence, including by withholding a key e-mail (attached to the Powers declaration), by pretending that Ms. Morgan-Wright is not preparing Schedule C returns or business returns, and by omitting from Nominees' production certain returns with dubious claims. All of this demonstrates that Defendants and Nominees are working together and are conscious of their guilt.

### B.  Nominees have also violated the Court's orders

Just as Defendants are liable for conducting this runaway train, Nominees should be held in contempt for hopping onboard. Because Nominees have already been shown to be working in active concert and participation with Defendants, the only bar to holding them in contempt is proving that they had actual knowledge, "by personal service or otherwise," of the Court's orders. Fed. R. Civ. P. 65(d)(2). "Circumstantial evidence establishing actual knowledge may be derived from the parties' relationship, concert of action in maintenance of the unlawful business, and the obvious interest of the defendants in evading any interference with their unlawful business as long as possible." *FTC v. Neiswonger*, 494 F. Supp. 2d 1067, 1079 (E.D. Mo. 2007) (internal quotation marks omitted), *aff'd*, 580 F.3d 769 (8th Cir. 2009); *see also United States v. Planes*, No. 8:18-cv-2726, ECF No. 202 at 23 (M.D. Fla. July 11, 2019) (favorably quoting *Neiswonger* and finding knowledge through circumstantial evidence). Additionally, all that is required is "knowledge of the mere existence of the injunction; not its precise terms." *Neiswonger*, 494 F. Supp. at 1097.

Nominees' knowledge is obvious from the record. At the outset, Nominees clearly have knowledge of the November 2017 injunction, information about which is "prominently posted" in the workplace they share with Defendants. ECF No. 83 at 14. Beyond that, Mr. Boone

testified at the evidentiary hearing that led to the restrictions that Nominees are violating. And Nominees' relationship with Defendants and their actions after the Court's March and August 2019 orders, including switching to paper returns and later applying for new EFINs, show their awareness. *Neiswonger*, 494 F. Supp. at 1097.[2]

## V.     Sanctions

The Court has "wide discretion" to craft a remedy for contempt. *United States v. City of Miami*, 195 F.3d 1292, 1298 (11th Cir. 1999). At a minimum, after hearing the evidence, the Court should permanently bar Defendants from preparing tax returns, as it warned it would if there were further violations. *See* ECF No. 83 at 17. The Court can also order disgorgement of ill-gotten gains. *Leshin*, 618 F.3d at 1237. Beyond that, the Court can expand the scope of the injunction to prevent Nominees from acting in concert with Defendants to violate its terms. Specifically, the Court can order Nominees to completely sever their activities from those of Defendants by prohibiting them from operating out of Defendants' office space and preparing returns for Defendants' prior customers. We submit that all of these sanctions are appropriate given the brazen nature of Defendants' and Nominees' contempt and their refusal to conform their activities to the restrictions the Court justifiably imposed to stop the harm they cause.

## Conclusion

Defendants have continued their longstanding contempt, and Nominees have joined them. The Court should therefore direct them to show cause why they should not be held in contempt. A proposed order is enclosed.

---

[2] Nominee Individuals' knowledge is imputed to Nominee Entities. *Planes*, ECF No. 202 at 23.

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing has been electronically filed this 28th day of

May, 2020 with the Court via CM/ECF, which will serve a copy on all counsel of record.

Additionally, on May 28, 2020, the foregoing was e-mailed to attorney Frank Rubino

(Frank@FrankRubino.com) for service upon Anthony Boone, Donellar Wims-Boone, Latesha

Temple, Melissa Morgan-Wright, Kelly Dunlop, Matthew Dunlop, Richard Wise, Professional

Accounting by R&K, Professional Accounting by MM, and Temple Financial Solutions.


s/ Robert S. Silverblatt
ROBERT S. SILVERBLATT
Trial Attorney